# EXHIBIT A

MICHAEL JAY GREEN      4451
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521-3336
Fax: (808) 566-0347
Email: michael@michaeljaygreen.com

GLENN H. UESUGI      4865
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521-3336
Fax: (808) 566-0347
Email: glenn.uesugi@gmail.com

Attorneys for Plaintiff
TOWER DEVELOPMENT, INC.

Electronically Filed
FIFTH CIRCUIT
5CCV-21-0000151
28-DEC-2021
02:08 PM
Dkt. 1 CMP

IN THE CIRCUIT COURT OF THE FIFTH CIRCUIT

STATE OF HAWAII

| | | |
|---|---|---|
| TOWER DEVELOPMENT, INC., | ) | CASE NO. _____ |
| | ) | [Contract] |
| Plaintiff, | ) | |
| | ) | COMPLAINT and DEMAND FOR JURY |
| vs. | ) | TRIAL |
| | ) | |
| TIMBERS RESORT MANAGEMENT, LLC; | ) | |
| and DOE DEFENDANTS 1-100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

COMES NOW, Plaintiff TOWER DEVELOPMENT, INC., by and through its attorneys

Michael Jay Green and Glenn H. Uesugi, and for Complaint against Defendants TIMBERS

RESORT MANAGEMENT, LLC and DOE DEFENDANTS 1-100, allege and aver as follows:

1.      Plaintiff TOWER DEVELOPMENT, INC. (hereinafter "Plaintiff TOWER

DEVELOPMENT" or "Plaintiff") and was at all times relevant herein a Hawaii corporation

EXHIBIT A

2.     Tower Development is a local Hawaiian private real estate investment and development company, which specializes in complex development and construction projects only in the State of Hawaii.

3.     Tower Development's and its affiliates portfolio has consisted of hospitality projects in Hawaii with values from $38 million to in excess of $200 million.

4.     Defendant TIMBERS RESORT MANAGEMENT, LLC (hereinafter "Defendant TIMBERS") is and was at all times relevant herein a Colorado limited liability company currently doing business in the County of Kauai, State of Hawaii.

5.     Upon information and belief, the employees, agents, associates, and/or representatives of Defendant TIMBERS RESORT MANAGEMENT, LLC and others who held themselves out as being employees, agents, associates, and/or representatives of Defendant TIMBERS RESORT MANAGEMENT, LLC, including but not limited to DAVID A. BURDEN and GREGORY SPENCER, were acting within the scope of such relationship. Defendant TIMBERS RESORT MANAGEMENT, LLC is therefore liable for all of the acts and/or omissions of its employees, agents and/or putative employees under the doctrine of respondeat superior, or are otherwise vicariously liable for their acts and omissions under principal/agent or master/servant principles.

6.     Upon information and belief, the employees, agents, associates, and/or representatives of Defendant TIMBERS RESORT MANAGEMENT, LLC, including but not limited to DAVID A. BURDEN and GREGORY SPENCER, were acting under the actual and/or apparent authority and/or agency of Defendant TIMBERS RESORT MANAGEMENT, LLC. Therefore, Defendant TIMBERS RESORT MANAGEMENT, LLC is liable for all acts and/or

omissions of the employees, agents, associates, and/or representatives of

Defendant TIMBERS RESORT MANAGEMENT, LLC under the theory of apparent

authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of

apparent authority/agency.

       7.      Plaintiff is ignorant of the true names and capacities of Defendants sued herein as

DOE DEFENDANTS 1-100 and therefore sue said Defendants by such fictitious names. Plaintiff

will amend its Complaint to allege their true names and thereon allege that each of the

fictitiously named Defendants are responsible in some manner for the occurrences herein

alleged, and that Plaintiffs damages, as herein alleged, were proximately caused by their

conduct. Plaintiff has made good faith and diligent efforts to identify said Defendants, including

interviewing individuals with knowledge of the claims herein. Plaintiff is informed and believe

and therefore allege that at all times herein mentioned, Defendants, and each of them, were the

agents, servants and employees of each of the other Defendants herein, and were acting with the

permission and consent and within the course and scope of said agency and employment.

## INTRODUCTION AND OVERVIEW OF ACTION

       8.      Defendant TIMBERS RESORT MANAGEMENT, LLC, a Colorado limited

liability company touts itself as a leading resort management firm with expertise in luxury resort

properties and strategies.

       9.      On the surface, this Lawsuit concerns a local Hawaii company (Plaintiff),

intending to restore a shuttered (as a result of the 2008 recession) luxury hotel/resort master

planned community for the benefit of Lihue, Kauai, the State of Hawaii, and tourism in Hawaii

and to assist in the creation of hundreds of hotel/resort jobs for Kauai and the people of Hawaii.

10.     Below the surface, this Lawsuit is truly about a mainland company, the Timbers Defendants, (who had no business presence in Hawaii at the time of being introduced to Tower) and their "below the waist" scheme to use and abuse a reputable local Hawaii Plaintiff's confidential information in violation of contractual obligations and steal away the development rights to an irreplaceable, priceless, once-in-a-lifetime 450-acre oceanfront luxury hotel/resort development with 694 fully-entitled (approved) hotel and resort units located on Kauai, State of Hawaii, commonly known as Kauai Lagoons, which is an integral part of the Lihue community (the "Kauai Deal").

11.     Defendants, after being introduced to the Kauai Deal by Plaintiff, conducted duplicitous and greedy dealings, which have inflicted staggering injury on Plaintiff, which injury currently totals over $64,000,000 and continues to grow based upon Defendants' ongoing wrongful conduct.

12.     Starting in 2014 and continuing to this day, the most senior principals of Defendants conspired to "set a trap" for Plaintiff with the intent of eliminating Plaintiff's hotel development plans and secretly conspiring how to inflate the value of its own Timbers company value and line Defendants' shareholder value and wallets, while creating disastrous injury and losses for Plaintiff.

13.     In November 2013, local Hawaii hotel developer Tower Development/Plaintiff, after a lengthy sales selection process was selected by Marriott Vacations Club (hereinafter "Marriott" and/or "Seller"), to purchase the Kauai Deal.

14.     Plaintiff then spent almost fourteen (14) months processing the transaction to purchase, develop, manage and operate the Kauai Deal as a Hawaiian luxury hotel resort

community.

15.     Based on Plaintiffs unsurpassed Hawaiian development reputation, Plaintiff

(without any other parties involved) was personally selected by Marriott due to the fact Plaintiff

was the preferred local Hawaii developer with the greatest local expertise with the likelihood of:

          a.     a successful purchase and closing;

          b.     ensuring to the Lihue community the creation of numerous hotel jobs for a

defunct construction project that was one-half (½) built;

          c.     ensuring a good working relationship with Kauai County to implement a

successful development that would be environmentally pleasing and implementing a successful

hotel master planned community to create hundreds of jobs for the Kauai community; and

          d.     working successfully with the Seller/Marriott at the Kauai Property

located adjacent based on the good working relationship between Plaintiff and Seller/Marriott.

16.     After Marriott analyzed all qualified potential buyers, Marriott chose Plaintiff

(and solely Plaintiff) in November 2013.

17.     Marriott and Plaintiff then negotiated a purchase and  sale letter of intent, which

was initially signed by and between Marriott and Plaintiff in December 2013 ("Letter of Intent").

18.     On April 25, 2014, after a lengthy and complex purchase agreement negotiation

between Marriott and Plaintiff, Plaintiff's founder Edward Bushor entered into a Purchase and

Sale Agreement (the "PSA") to allow Plaintiff to acquire the entire 450 ocean-front golf course

and 694 developable units known as the Kauai Deal for $60 million from Marriott.

19.     A key point is that, in light of Marriott's investment and other improvements

made into the Kauai Deal in excess of $200,000,000, Marriott's selection of Plaintiff to purchase

the Kauai Deal for just $60,000,000 was one of the best development deals Plaintiff had ever processed in Hawaii.

20.     The Kauai Deal is a development that Defendants were not selected to develop, nor had any right to develop but for secretly trying to implement a scheme to insert itself into the Kauai Deal and eliminate Plaintiff from the project, after Plaintiff completed 14 months of hard work to purchase the Kauai Deal.

21.     A second key point is Plaintiff executed:

        a.      the Letter of Intent to purchase the Kauai Deal seven (7) months before interacting with Defendants; and

        b.      the Purchase Agreement three (3) months before Plaintiff entered into the "Non-Compete Agreement" (defined herein) with Defendants, which Defendants ultimately ignored and sought to undermine Plaintiff's development plan in favor of implementing Defendants Secret Timbers Development Plan (defined herein) in direct violation of the "Timbers Non-Compete Agreement (defined below)."

22.     After Plaintiff signed the PSA, and after being in escrow for three (3) months, Plaintiff initially called Defendants on or about July 2014 to potentially interview them as one (1) of numerous consultants that Plaintiff would contemplate hiring in the Plaintiffs development of the 694 hotel, condominium, timeshare and residential resort units for the 450-acre Kauai Deal, which was one of the largest "fully entitled" and "ready-to-build" development sites in the entire State of Hawaii.

23.     At no time did Plaintiff ever believe Defendants were qualified to act as a

developer in Hawaii or would attempt to covertly replace Plaintiff as the "developer", which was the scheme Defendants immediately commenced after Plaintiff called Defendant to be a consultant for Plaintiff.

24. Without the knowledge of Plaintiff, Defendants literally became secretly engrossed in a self-serving scheme to remove Plaintiff as the master plan developer and insert themselves as the developer despite the fact Defendants executed a "Timbers Non-Compete Agreement" (defined below) expressly prohibiting such competitive right.

25. Plaintiffs introduced Defendants to the Kauai Deal only after informing Defendants of the importance of having Defendants as a potential consultant only if Defendants had no intention to complete with Plaintiffs relating to the Kauai Deal.

26. Not only did Defendants agree in conversations with Plaintiff to this understanding, Defendants agreed in writing that Defendants had no intention to compete with Plaintiff and would not compete with Plaintiff.

27. In July 2014, Defendant Timbers Resort Management, LLC, and specifically the founder and Chief Executive Officer at the time, David Burden, and Edward Bushor of Plaintiff Tower Development, Inc., signed a Confidentiality, Non-disclosure and Non-Compete Agreement ("Non-Compete Agreement").

28. The Non-Compete Agreement includes the following express provision:

> 4. **Non-Compete.** It is acknowledged Company [Tower] is in the process of acquiring, developing, negotiating and/or entitling the Project listed on Exhibit "A" and is requesting PFP [Timbers] to be a timeshare joint venture partner, consultant, operator and or other participant in the transaction. Thus, if PFP !Timbers] elects not to joint venture or otherwise be involved in the transaction with Company, **PFP [Timbers] agrees that the business concepts disclosed by Company to PFP[Timbers] shall not be used by**

**PFP [Timbers] to interfere and/or compete with Company [Tower] relating to the Project [Kauai Deal] during the term of this Agreement."** (Emphasis added).

29.     This Lawsuit is centrally focused on the fact that for the two (2) months immediately after Defendants signed the Non-Compete Agreement that expressly states Defendants would not compete with Plaintiff, Defendants secretly prepared secret plans (that directly competed with Plaintiff Tower's plan) ("Secret Timbers Development Plan").

30.     The second key fact is that Timbers Defendants used confidential and property information that was created by Plaintiff and plagiarized by Defendants to create the Secret Timbers Development Plan.

31.     The third key fact is that the two most prominent directors and officers of Timbers, the founder of Timbers David Burden, and the President Gregory Spencer, were involved in the scheme in order to line their own pockets and pretended to be on Tower's team. Instead, they aligned themselves as a consultant of Tower while secretly and fraudulently creating the Secret Timbers Development Plan and scheme to insert Timbers and themselves and replace Tower's role as the lead developer of the Kauai Deal securing for Timbers and themselves all the income and development rights that would otherwise been Tower, if Defendants would not have violated the Non-Compete Agreement.

32.     The fourth and most damaging fact to Defendants is that for almost 2 years, Timbers concealed all of these facts and never disclosed to Plaintiff (a) that Defendants created the Secret Timbers Development Plan or (b) the self-serving scheme to promote Defendants' development plan as the best alternative for the Kauai Deal over Plaintiff's development plan, which was the competitive opinion that is in direct conflict with David Burden's commitment

- 8 -

when he signed the Timbers Non-Compete Agreement.

33.     Plaintiff found out about Timbers Secret Development Plan two (2) full years after it was secretly created and implemented in violation of the Timbers Non-Compete Agreement.

34.     Plaintiff was "duped" to allow Defendants to come in as a consultant to the Kauai Deal, all the while Defendants had no intention to be a consultant but instead deceptively have the mainland Timbers company replace the local Hawaii Plaintiff as the developer of one of the best development Plaintiff Tower could ever imagine in the State of Hawaii.

35.     All the time, Plaintiff never knew Defendants had postured the Secret Development Plan to Plaintiffs Equity Partner (while in escrow under the PSA!) that Defendants should be the master developer, in direct violation of the Non-Compete Agreement, and today is implementing the Timbers Secret Development Plan to the detriment of Plaintiff of over $64,000,000 in losses and damages all in violation of the Timbers Non-Compete Agreement.

36.     In utter disbelief that Defendants would prepare such a plan that eliminated Plaintiff from being the master developer of the Kauai Deal, Plaintiff now seeks to recover every dollar of loss and all damages arising from this deceitful, fraudulent and tortious conduct of Defendants and for Defendants' violation of the Non-Compete Agreement which strictly prohibited Defendants from conducting all actions related to the Timbers Secret Development Plan.

37.     Timbers did not disclose to Plaintiffs the contents of the Timbers Secret Development Plan at any time between the date Timbers signed the Non-Compete Agreement in 2014 until on or about July 2016 ("Concealment Period") because Defendants had to conceal the

scheme to tout its own Timbers Secret Development Plan as superior to Plaintiffs hotel plans to enable Defendants to be inserted into the development before Plaintiff discovered the violation of the Non-Compete Agreement.

38. Defendants knew if Plaintiff found out about the scheme of a Timbers Secret Development Plan prior to the close of escrow of the PSA, Plaintiff would have immediately cut ties with Defendants and all of Timbers' affiliates relating to the Kauai Deal after Defendants fraudulently befriended Tower as a "mere consultant before the closing of the PSA."

39. hi fact, Plaintiff would have barred any involvement of Defendants before the purchase of the Kauai Deal, if Plaintiff had known of the facts surrounding the Timbers Secret Development Plan, which occurred without Plaintiffs knowledge three and one-half (3 ½) months prior to the close of escrow under the PSA.

40. Instead, Plaintiff has been removed from being the developer without any development rights in favor of Defendants' hidden plan years later since Defendants are implementing the development plan originally schemed in the Timbers Secret Development Plan.

41. Defendants premeditated deceitful conduct to hide the plan "forever" was purposeful since it contained Defendants' express business plans to eliminate Plaintiff from being the developer of the Kauai Deal, which was directly contrary to Plaintiffs business plan to develop a 200 room hotel to anchor the master planned resort community and in violation of the Timbers Non-Compete Agreement.

42. After Plaintiff completed eight (8) months of escrow and satisfied all conditions of the Purchase Agreement for the closing between Seller and Plaintiff as Buyer, the closing of

the PSA for the Kauai Deal was set for December 31, 2014.

43.     The PSA closing date occurred some fourteen (14) months after Plaintiff commenced an incredibly intensive process to purchase the Kauai Deal and after Plaintiff incurred hundreds of thousands of dollars of due diligence costs and over one thousand (1000) hours of development planning and work on the Kauai Deal.

44.     On or about, December 22, 2014, Defendants put in motion their "grand finale" to this incredible scheme to insert itself into the Kauai Deal by secretly communicating with Plaintiff's private equity partner ("Equity Partner") (nine (9) days before the Plaintiffs PSA closing date), where upon, Defendant discussed with Plaintiffs Equity Partner that it should only do the development with Plaintiff if Defendants were inserted into the Kauai Deal with the secret goal to be the sole developer in accordance with the Timbers Secret Development Plan. Upon closing of the PSA on or about December 31, 2014, the Ownership documents were revised and included Plaintiffs as a co-manager with Tower, which would never have been approved by Tower Plaintiff had Plaintiff knew of the violations of the Non- Compete Agreement by Timbers.

45.     On the Closing of the PSA, Defendants hidden agenda was to their own development consistent with the Timbers Secret Development Plan and replace Plaintiff in the role Plaintiff had planned for itself throughout the PSA eight (8) month escrow period.

46.     Approximately eleven months after the purchase of the Kauai Deal, on December 4, 2015, Defendants were formally approved to develop a Timbers "Fractional project" and were authorized to be the developer of the Kauai Deal, which is the business plan consistent with the Timbers Secret Development Plan. But this was still without either Timbers or Plaintiffs Equity

Partner ever disclosing to Plaintiff the fact Defendants created the deceitful Timbers Secret Development Plan BEFORE the purchase of the Kauai Deal--all the time Defendants hiding the fact from Plaintiff of (x) the Timbers Secret Development Plan and (y) numerous other secret communications in direct violation and in competition with Plaintiff and obviously in disregard to Defendants' contractual obligations and commitments in the Timbers Non-Compete Agreement.

47.     Pursuant to the Timbers Non-Compete Agreement, Plaintiff discussed openly, the business plans for the Kauai Deal development projects with Defendants during the initial two (2) months after signing the Timbers Non-Compete Agreement. Plaintiff also provided inside proprietary company information regarding plans, development information and local Hawaii contacts and relationships, including without limitation an Investment Opportunity Memorandum on July 23, 2014.

48.     Defendants agreed to keep the information strictly confidential and further agreed in writing in the Timbers Non-Compete Agreement that "it would not use any of the business concepts disclosed by Tower Development to interfere and/or compete with Tower Development relating to the Kauai Property."

49.     Within two (2) months of receiving the confidential investment information prepared by Plaintiff, Defendants sought to use such information for their own financial benefit and secret scheme.

50.     Once Defendants recognized the irreplaceable and priceless opportunity of the Kauai Deal (including the 694 fully-entitled, approved luxury resort units, which would take I 0 years and $250 million at the very least to replicate elsewhere "if it could ever be approved

again in Kauai County, which is also highly doubtful), Defendants decided they wanted all of Plaintiff's development rights in the Kauai Deal for themselves.

51.     But Defendants had a glaring problem - Defendants were only a potential consultant subject to the Timbers Non-Compete Agreement and did not own or control the PSA (Plaintiff did); Defendants did not own the valuable entitlements; Defendants lacked a local presence in Hawaii; Defendants Jacked local governmental contacts, and lacked the local development expertise that Mr. Edward Bushor (President of Plaintiff) and Plaintiff have.

52.     Knowing they lacked all these things, Defendants needed to continue the plot during the entire escrow and after the closing of the PSA without disclosing the Secret Timbers Development Plan or Defendants' true intent.

53.     For two (2) years, the Defendant Timbers successfully concealed from Plaintiff the Timbers Secret Development Plan.

54.     That intentional concealment was absolutely necessary to dupe Plaintiff in the Kauai Deal as Plaintiff continued in the processing of the PSA escrow to closing from April 2014 until December 31, 2014, and thereafter during the Plaintiff's ownership of Kauai Deal for eleven months from December 31, 2014, until the date Defendants finished springing the trap to be inserted to develop the Kauai Deal with Plaintiffs Equity partner, which occurred with Ownership's formal approval of the Timbers plans on or about December 4, 2015.

55.     Plaintiff and Plaintiff's Equity Partner, ("Equity Partner"), spent eight (8) months processing the joint venture ("Joint Venture") and were the only two exclusive partners in the Joint Venture (and their respective ownership affiliate entities) while in escrow for the purchase of the Kauai Deal.

56.     Defendants had no ownership or development rights or any other equity interest in the Joint Venture during the escrow and prior to the closing date of December 31, 2014.

57.     Defendants' concealment of the Timbers Secret Development Plan from the date it was started on or about July 2014 and ultimately finalized without disclosure to Plaintiff prior to the closing of the PSA by Plaintiff, was the key to convincing the Equity Partner that the Timbers Secret Development Plan should be adopted instead of Plaintiffs plan since Plaintiff was an innocent bystander in the Joint Venture, believing Plaintiffs own development was not in threat of competition.

58.     This period of concealment was long enough to:

            a.      ensure that Defendants could eliminate any attempt by Plaintiff to terminate the relationship of Timbers in the development before it would get approved by the Plaintiffs Equity Partner;

            b.      ensure that Defendants could eliminate any attempt by Plaintiff to select another new equity partner if Plaintiff was aware that Timbers and the Equity Partner were conspiring to insert Defendants into Plaintiffs development role in the Joint Venture;

            c.      give Defendants all of the knowledge about the Kauai Deal, including Plaintiffs extensive work product;

            d.      create an "appearance" of a local presence for Defendants by aligning as "friends and consultants" with Plaintiff and working with Plaintiffs attorneys and consultants that were hired by Plaintiff; and

            e.      perhaps most importantly, allow Defendants to market and sell their ideas of their self-dealing Secret Timbers Development Plan to Plaintiff's Equity Partner and

ultimately implemented by the Timbers Defendant.

59. At the last moment, mere days before escrow was closing on the Plaintiff's PSA on the Kauai Deal, Defendants sprung their trap when they knew that Plaintiff had no alternative but to close escrow a few days later.

60. Plaintiff has since learned that Defendants concocted their hidden Secret Timbers Development Plan consisting of materials describing how to replace Plaintiff from entire deal and the first phase of the Timbers development recommended and cited expressly in the Secret Timbers Development Plan was actually opened to the public in June 2018.

61. During the time Plaintiffs preparing the Timbers Secret Development Plan, on or about August 28, 2014, Timbers Resort Management, LLC, closed a transaction with Plaintiffs Equity Partner (and/or direct affiliate thereof), whereby an affiliate of Plaintiffs's Equity Partner, made an investment to become the majority shareholder of Timbers Resort Management, LLC.

62. The material facts of having a major investment into Defendants of a controlling shareholder necessitated an elevated need to conceal the "Secret Timbers Development Plan" and evidences the bad faith concealment motive of Defendants.

63. Moreover, Defendants did not disclose to Plaintiff the scope of Defendants' intention to be brought into the Kauai Deal in a development role to supplant Plaintiffs developer status, which is clearly in violation of the Timbers Non-Compete Agreement.

64. Further, in its dealings with Plaintiff, Defendants continued, from July 2014 to the time of closing under the PSA in December 2014 (for 5 months), to maintain the fa9ade that it supported the development of the Kauai Deal as a "Tower Development" and further supported Tower's planned phase one, which was a 200-room hotel with a luxury global brand, until just

days before Christmas and the escrow closing date in December 2014, when it was disclosed by

Plaintiff's Equity Partner that it would be advantageous to have Timbers added to the team of

development management.

65.     Plaintiff is informed and believes, and upon such information and belief alleges,

that Defendants secretly planned from the start to ignore the Non-Compete Agreement and have

Timbers Resort Management supplant Plaintiff's role for the purpose of significantly increasing

the shareholder value of the Timbers Resort Management LLC and making it extremely more

profitable by receiving the numerous fees associated with being a developer in a master planned

community such as the Kauai Deal.

66.     Using Plaintiff's materials (including business plans and financial spreadsheets

that took months to develop  and prepare by Plaintiff), that Defendants  wrongfully modified into

its own Secret Timbers Development Plan, Defendants then sought,  without informing  Plaintiff,

to win over Plaintiff's Equity Partner to supplant itself into the developer role instead of Plaintiff.

67.     Wrongfully piggy-backing on Plaintiff's confidential materials,  Defendant

Timbers Resort Management purportedly accomplished a plan to eliminate Plaintiff from the

development in days or weeks that had taken Plaintiff seven months of due diligence, $1 million

in escrow deposits (deposits delivered into escrow by Plaintiffs only) and $250,000 in expenses

during escrow, and over 1000 hours of Plaintiff's development time and work.

68.     The only way Defendant Timbers Resort Management was able to accomplish

this

feat was by using Plaintiffs underwriting, due diligence data, financial pro formas and other

documents received by Defendants but with the understanding it would not ever be used by

- 16 -

Timber's Defendant to compete with Plaintiff as agreed in the Non-Compete Agreement.

69.     In September 2014, without disclosing to Plaintiff, or even informing Plaintiff of the facts of the Secret Timbers Development Plan prepared by Defendants, Defendant Timbers Resort Management secretly made a formal presentation to the Equity Partner of Plaintiff for the purpose of eliminating Plaintiff from developing the Kauai Deal and instead, as the Secret Timbers Development Plan outlines, inserting Timbers Resort Management in the role of developer of a self-interested Timbers Resorts business plan.

70.     Defendants' use of Plaintiff business plans and confidential information to compete with Plaintiff mere weeks after entering into the Timbers Non-Compete Agreement was a material and grave violation of the Timbers Non-Compete Agreement and a blatant unfair business practice and a malicious and tortious interference with Tower's prospective economic advantage.

71.     Plaintiff has since learned that Defendants conspired to conceal their imminent business relationship with Plaintiffs Equity Partner from Plaintiff.

72.     Indeed, during the time period that Plaintiff would have terminated all discussions with Timbers and also Tower's Equity Partner too, the Chief Operating Officer (now Chief Executive Officer), Plaintiff is informed and believes, and upon such information and belief alleges Mr. Gregory Spencer had the audacity to agree with Plaintiff's Equity Partner to hide the sale of Timbers controlling interest to said Equity Partner and maintain it secret and confidential from Plaintiff.

73.     Plaintiff is informed and believes, and upon such information and belief alleges, that Mr. Gregory Spencer wanted to maintain the Timbers Resort Management receipt of an

investment by Plaintiffs Equity Partner and their relationship confidential for the purpose of improperly obtaining Plaintiffs confidential business plans and later using of those plans to supplant Plaintiffs development role.

74.    Had Plaintiff known of the true and secret relationship between Defendants and Equity Partner, especially Defendants' scheme to wrest the Kauai Deal from Plaintiff as put in writing in the Secret Timbers Development Plan, it never would have continued their business dealings with Defendants and would have bared any involvement of Defendants.

75.    Defendants' hidden "trap" still set, Defendants continued to exchange confidential materials without Plaintiffs consent or awareness, and they continued to admonish each other to maintain the secrecy of Defendants' true intent and the Secret Timbers Development Plan.

76.    After the Third Amendment to Purchase Agreement was negotiated and executed by the Joint Venture on December 8, 2014 - a crucial item that Defendants realized Plaintiff would need to sign with Marriott before it sprung the "trap" - on or about December 22, 2014, the consortium of the now controlling interest in Defendant Timbers Resort Management, LLC, namely a Board of Director Mr. Kim of Timbers and also employee of the Equity Partner, called Mr. Bushor to trick him into changing the entire workings of Plaintiffs legacy development at the Kauai Deal.

77.    This was after 8 months of escrow and mere days before the December 31, 2014 close of escrow under the Purchase Agreement and after over $1 million was incurred by Plaintiff to close the PSA.

78.    With the close of escrow on the Kauai Deal looming within a week, and obviously no time to secure a new source for the private equity limited monetary partner for

Plaintiffs joint venture that required the $60,000,000 funding (which is a typical 3 month

process in the industry), Defendants secretly had Plaintiff right where they wanted it and

supported the scheme to have the Private Equity ask Plaintiff whether Plaintiff would prefer to

terminate the deal or modify the Kauai Deal to allow Defendants to be inserted as a

co-manager of the ownership entity along side of Plaintiff in order for a successful development

and further to agree to reassess all business plans after the closing.

79.     Unbeknownst to Plaintiff of the scheme being implemented by Defendants,

Plaintiff agreed and actually trusted Defendants and the Equity Partner that they had good faith

intentions - not a Secret Timbers Development Plan under their desk.

80.     However, both Defendants and Equity Partner did not disclose to Mr. Bushor

and/or Plaintiff that they had a new plan - the Secret Timbers Development Plan.

81.     Instead, Defendants and Equity Partner made statements about needing to merely

close escrow under a modified joint venture and then reassess the Kauai Deal with a goal of

reassessing and "creating" a new master development plan after the closing of the PSA (yet

Defendants secretly already had a secret written plan in their possession which they concealed

from Plaintiff.

82.     Little did Mr. Bushor and/or Plaintiff know that Defendants, as a co-manager with

Plaintiff, planned to ignore all of Plaintiffs hotel business plans due to the fact Defendants

intended only to allow the Kauai Deal to be branded only as a "Timbers Resort", placing

Plaintiffs development plans in the trash and never looking at any other alternatives other than

Secret Timbers Development Plan solely focused on creating a "Timbers Resort" out of the

entire Kauai Deal.

83.     After the closing of the PSA, Defendants focused 100% of all resources solely to analyzing only a Timbers Resort and never processed any bids or proposals from any competitive hotel brands or any of Plaintiffs original proposed hotel deals.

84.     Instead, the only goal of Defendants was having Timbers Resort Management take all of Plaintiffs development fees and profits consistent with the Secret Timbers Development Plan known only by Defendants.

85.     Mr. Bushor and/or Plaintiff, naively, accepted the process of having Defendants added as a "co-manager" into the ownership documents between Plaintiff and Plaintiffs Equity Partner because Mr. Bushor did not know about the concealed material facts, including the Secret Timbers Development Plan and all of the secret communications and documents between Timbers Resort Management and Plaintiff's Equity Partner, all in violation of the Timbers Non-Compete Agreement.

86.     Moreover, Mr. Bushor and/or Plaintiff had no idea that the intention of Defendants, as a "co-manager," was to ignore an obviously more profitable Plaintiff's Phase 1 development plan for the 200-room luxury hotel/resort development and, further, that Defendant would not even assess in good faith a comparison of investment returns based on Defendants plans versus Plaintiffs developments plans after the PSA escrow closed and instead merely pursue only the Secret Timbers Development Plan without regard to profits of the competitive plans between Plaintiff and Defendants.

87.     1bis was due to the fact that Defendants sought to steal away all of the profits otherwise entitled to Plaintiff had Plaintiffs Phase 1 development plan been adopted.

88.     The Secret Timbers Development Plan (only recently discovered by

Plaintiff) is being implemented to this day in a manner consistent with Defendant Timbers Resort Management's clandestine presentation to Plaintiffs Equity Partner in September/October 2014, without Plaintiff's involvement whatsoever and in strict violation of the Timbers Non-Compete Agreement.

89.     Once Defendants appreciated the irreplaceable and priceless opportunity of 694 fully entitled luxury resort units in Kauai, (which would take 10 years to replicate if it could ever be approved in the future), Defendants knew they had to develop the property for themselves and to be the "developer" to elevate Timbers shareholder value irrespective of the investment returns to the owners (meaning Plaintiff) of the Kauai Deal.

90.     Defendants did not own any interest in the Kauai Deal after the closing or the property or its valuable entitlements, and they lacked a local presence with local development contacts.

91.     Therefore, they came up with a plan to dupe Plaintiff into continuing with the project long enough to spring their trap at the last moment when they knew that Plaintiff had no alternative but to allow to add Defendants as a "co-manager", thinking Defendants would be fair to Plaintiffs original plans as a "manager."

92.     After inducing Mr. Bushor and Plaintiff into a new structure based on concealed material facts, Mr. Bushor and/or Plaintiff agreed to modify the Joint Venture with the Tower Equity Partner.

93.     The parties modified the terms of the Original Joint Venture and entered into a formal modified Joint Venture Agreement on December 29, 2014 ("Modified Joint Venture Agreement").

94.     The Modified Joint Venture Agreement added the Timbers Defendants as a

"co-manager" but without any ownership of the real estate.

95.     Plaintiff now knows why the Modified Joint Venture eliminated all exhibits detailing the business plans known by Timbers only, although it was concealed from them at the time, that Defendants did not want to list the Secret Timbers Development Plan as the business plan because Mr. Bushor and/or Plaintiff would recognize the concealment, and the "trap" would have been obvious to Plaintiff.

96.     With Plaintiffs signatures on the Modified Joint Venture Agreement, Defendants' covert plan to insert itself in the Kauai Deal and still benefit from the "appearance" of Plaintiffs local expertise, contacts, and local reputation over 16 years of developing in Hawaii, was coming to fruition.

97.     In fact, Defendants supported the name of the Joint Venture being "Tower Kauai Lagoons LLC" in order to ride the coattails of Plaintiffs reputation.

98.     Defendants then moved to the next stage of their conspiracy by "springing their trap." Over the course of the next year after the closing and continuing to this day, Defendants have continued the plan consistent with the Secret Timbers Development Plan and continue the material breach of the Non-Compete Agreement by, among other things:

        a.      Processing the Secret Timbers Development Plan and creating and entering into contracts or agreements for fees and compensation in favor of Timbers Resort Management and/or its affiliates or personnel, all without Plaintiffs required approval in advance of competing with Plaintiff;

b.      Approving an $8 million land price allocation of the same parcel of the Kauai Deal in competition with Plaintiff that Plaintiff had proposed with a luxury hotel for a land allocation in excess of $20 million;

c.      Creating and entering into a contract or agreement by Defendant Timbers Resort Management to allow development of the Kauai Deal as a "Timbers Resort" in a manner that failed to request the approval from Tower to compete with Tower and failed to comply with and is thus in violation of the Timbers Non-Complete Agreement;

d.      Refusing to provide Plaintiff with books and records of the Kauai Deal, including but not limited to books and records reflecting all contracts or agreements or understandings in favor of Timbers Resort Management, and fees or other compensation paid to, or for the benefit of, Timbers Resort Management and its executives and employees at above market rates and terms; and

e.      Implementing the Secret Timbers Development Plan which was designed to maximize fee income and compensation and value only to Defendants (as an "affiliate" of the Equity Partner), at the expense of Plaintiff's profits as protected by the Timbers Non-Compete Agreement.

99.     As a result of the above wrongful conduct on the part of Defendants alleged above, Defendants wrongfully prevented Plaintiff from receiving both Development Fees totaling approximately $13.32 million and Sponsor Promote profits totaling approximately $51.4 million (figures taken from Plaintiff's Equity Partner's own underwritten financial investment model dated December 8, 2014).

100.    Instead of allowing Plaintiff to receive its' rightfully earned compensation,

Defendants are moving forward with their own purposely-concealed plan of developing and managing the Kauai Deal (excluding any of Plaintiffs development plans which are more profitable ventures for the Kauai Deal) and retaining the vast majority of their ill-gotten proceeds, all exactly as originally secretly planned by Defendants consistent with the Secret Timbers Development Plan.

## FACTUAL ALLEGATIONS

### A.    Plaintiff's Acquisition Of The Kauai Property and Entering Into Confidential Relationships With Defendants

101.    Plaintiff is a Hawaii-based private development and investment company comprised of several affiliate real estate operating companies.

102.    Plaintiff is a culmination of many Hawaii development success stories including redeveloping hotels in Hawaii, the most recent being in Hilo, Hawaii, being the Grand Naniloa Hotel, a Doubletree by Hilton.

103.    The Chief Executive Officer of Plaintiff is Edward Bushor.

104.    Stuart Miller is Plaintiff's current President.

105.    Together, Mr. Bushor and Mr. Miller have over three decades of experience in Hawaii alone in real estate development and construction.

106.    On or about April 25, 2014, Plaintiff entered into a Purchase and Sale Agreement ("PSA") with Kauai Lagoons LLC and MORI Golf (Kauai), LLC ("Seller") for the purpose of purchasing the master planned community commonly referred to as the Kauai Lagoons Resort on the Island of Kauai in the State of Hawaii (defined above as the "Kauai Deal").

107.    Plaintiff agreed to pay Seller the aggregate purchase price of $60,000,000 to acquire the Kauai Deal.

108.    On or about April 25th, Plaintiff went into escrow on the Kauai Deal, which was scheduled to close in October 2014. The closing date was later pushed back to December 31, 2014, based on Seller and Plaintiff mutually agreeing upon amendments to the PSA signed by the Plaintiff and Seller.

109.    Around the time Mr. Bushor, on behalf of Plaintiff executed the PSA on April 25, 2014, he and Mr. Miller had discussions with multiple private equity firms such as the mainland based company Oaktree Real Estate ("Equity Partner") regarding the securing of a private equity partner for funding the purchase and development of the Kauai Deal.

110.    Defendants and Equity Partner would later recognize correctly that Mr. Bushor brought the entire deal to Oaktree Real Estate after the PSA was executed and deposits were given to escrow solely by Mr. Bushor and/or Plaintiff.

111.    Initially, Oaktree Real Estate, as Equity Partner stated in discussions directly with Plaintiff, Stuart Miller and Ed Bushor, that Plaintiff should, therefore, be the "Developer" of the Kauai Deal and receive a "Developer" compensation package for such role, which was inserted into the "Original Joint Venture" (defined below) and that Equity Partner was committed to closing the Kauai Deal with Plaintiff.

112.    Regrettably, as discussed below, Defendants would later secretly scheme to wrongfully compete with Plaintiff and recommend to Plaintiff's Equity Partner, Oaktree Real Estate, that only Defendants should be the developer in order to strip Plaintiff of that role, which is tl1e role that entitles Plaintiff to receive over $64 million in fees and profits related to the Kauai Deal.

113.    In late June 2014, Mr. Miller sent a draft non-disclosure agreement to Gary

- 25 -

Moore at Timbers Resort Management and indicated that Plaintiff was interested in chatting with Timbers Resort Management about a master planned hospitality / mixed use high end luxury projects in Hawaii.

114. Mr. Moore forwarded Mr. Miller's email to David A. Burden and Gregory Spencer, Timbers Resort Management's Executive Chairman and Chief Executive Officer, respective y.

115. Mr. Spencer subsequently communicated with Mr. Kim at Oaktree Real Estate and they both agreed to conceal the "deal" from Plaintiff.

116. The reference to "deal" was the transaction whereby Timbers was selling the controlling interest of Defendant Timbers Resort Management to Oaktree Real Estate (that Plaintiff was unaware of and was completed behind Plaintiffs back.)

117. Mr. Spencer, Mr. Burden and Mr. Moore further communicated with each other that Defendants would not be informing Plaintiff of the "deal."

118. As of July 2014 and the date of signing the Timbers Non-Compete Agreement, Plaintiff had no knowledge of any "deal" or "transaction" between Oak.tree Real Estate and Defendant Timbers Resort Management, and no Defendant disclosed to Plaintiff the existence of any such "deal."

119. Had Plaintiff known of the "deal" and intent of Timbers Defendants to replace Tower as the developer and of the Timbers Secret Development Plan to insert Defendants into Plaintiffs shoes as the "developer" in the Kauai Deal, Plaintiff would have terminated their relationship with Defendants and moreover would have found alternative private equity joint venture partners and terminated the Original Joint Venture negotiations with Oaktree Real

Estate.

120.     Unaware of the "deal" between Oaktree Real Estate and Timbers Resort Management, in mid-July 2014, Plaintiff and Timbers Resort Management entered into the Timbers Non-Compete Agreement.

121.     Mr. Bushor signed the Timbers Non-Compete Agreement on behalf of Plaintiff and Defendant David A. Burden signed on behalf of Defendant Timbers Resort Management.

122.     Plaintiff and Defendant Timbers Resort Management entered into the Timbers Non-Compete Agreement for the express purpose of:

        a.     engaging in discussions related to Plaintiffs processing of the development of the Kauai Deal, Plaintiffs business plans for the Kauai Deal, Plaintiffs work product, potential investment returns and strategies related to the Kauai Deal; and

        b.     determining if Timbers would be a good fit as consultant to be hired by Tower in the Kauai Deal;

        c.     to insure the information of Plaintiff was maintained confidential and to contract that Timbers Resort Management would not compete with Plaintiff with respect to the Kauai Property, which is expressly stated therein.

123.     Pursuant to the Timbers Non-Compete Agreement, Defendant Timbers Resort Management expressly agreed to maintain the information disclosed by Plaintiff and discussions between the parties related to the agreement as confidential information for the sole purpose of allowing Plaintiff to complete the project development and not to use the information to create a plan that would be purported as "better" or would compete with Plaintiff.

124.    Defendant Timbers Resort Management further agreed that it would not disclose Plaintiffs confidential information to any third parties and would not use any confidential information for any purpose except for the purpose discussed in the Timbers Non-Compete Agreement.

125.    Defendant Timbers Resort Management also agreed that it would not use any of the business concepts disclosed by Plaintiff to interfere and/or compete with Plaintiff with respect to the Kauai Deal.

**B.    Defendants Breach The Non-Compete With Plaintiff**

126.    It took Plaintiff approximately seven months to assemble and underwrite the various development phases (approximately six-seven different phases and project costs that could reach 800 million dollars) of the Kauai Deal in order to present its joint venture plan to Oaktree Real Estate in mid-2014.

127.    Plaintiff is informed and believes, and upon such information and belief alleges, that very shortly after Mr. Burden and Timbers executed the Timbers Non-Compete, Defendants used all of Plaintiffs proforma analyses, due diligence and business plans of Plaintiff to create a competing plan laced with Timbers being the developer that would compete with Plaintiffs plan, in violation of the Timbers Non-Compete Agreement.

128.    Plaintiff is informed and believes, and upon such information and belief alleges, right after the Timbers Non-Compete Agreement was signed, Timbers Resort Management immediately used Plaintiffs confidential information to develop its own proposal to Oaktree Real Estate to eliminate Plaintiffs business plan and cut out Plaintiff, using Plaintiffs own information that took Plaintiffs months to prepare.

129. Plaintiff is informed and believes, and upon such information and belief alleges, Mr. Spencer shared the Timbers Non-Compete Agreement with third parties without asking for consent of Plaintiffs, which clearly acknowledged the fact Mr. Spencer had no regard with complying with the tem1s therein and simply wanted other third parties involved in the Kauai Deal to know of the risks in preparing the "competing plans" in favor of Defendants all the time knowing Timbers was acting in violation of the Timbers Non-Compete Agreement.

130. Aware of the "non-compete" provisions, Mr. Spencer, Chairman Mr. Burden and Timbers Resort Management as Defendants would nevertheless proceed with their scheme to conceal facts from Plaintiff, their secret development plans as they pretended to be on Tower's team as they reviewed the Kauai Deal.

131. Mr. Spencer, while pretending to be Plaintiffs friend, received Plaintiffs numerous confidential documents of Plaintiff including without limitation Plaintiffs development strategy and proprietary plans relating to the Kauai Deal.

132. Plaintiff is informed and believes, and upon such information and belief alleges, Mr. Spencer took the lead on strategy, and he thought Timbers Resort Management should present to Oaktree a different and "better" Timbers competitive development plan.

133. Plaintiff is informed and believes, and upon such information and belief alleges, less than sixty (60) days after entering into the Timbers Non-Compete Agreement, Timbers Resort Management's principals were disparaging Plaintiff (with none other than Plaintiffs Equity Partner!) and making plans to compete with Plaintiff over the Kauai Deal - both of which directly violated the Timbers Non-Compete Agreement.

134. Plaintiff is informed and believes, and upon such information and belief alleges,

Defendants' conduct violated the terms of the Non-Compete Agreement by conspiring on how to prepare plans that compete with Plaintiff, all the time never disclosing to Plaintiff or asking Tower for consent to preparing competitive plans.

135.    Plaintiff is informed and believes, and upon such information and belief alleges, using Plaintiffs confidential models and information supplied to Defendants, Mr. Spencer and Mr. Cuthbertson of Timbers Defendant, with the support and assistance of Mr. Burden, began secretly drafting their own models and presentations that inserted Timbers and themselves and their own self-centered development plans for the Kauai Deal (all to eliminate both Plaintiffs months of work on Tower's own development plans).

136.    Plaintiff is informed and believes, and upon such information and belief alleges, Defendants modified Plaintiffs confidential information and inserted (at least in Timbers belief) a "better" Timbers competitive development plan.

137.    Plaintiff is informed and believes, and upon such information and belief alleges, unbeknownst to Plaintiff, Defendants , within ninety (90) days after signing the Timbers Non-Compete, flew to Los Angeles and personally pitched their own secret plan to Plaintiffs Equity Partner defined herein above as the "Secret Timbers Development Plan."

138.    Plaintiff is informed and believes, and upon such information and belief alleges, Mr. Spencer further communicated with Plaintiff Equity Partner that he questioned Plaintiffs plan and that some of Plaintiffs concepts did not make sense and recommended Timbers "better" plan.

139.    In Mr. Spencer's own words, Defendant Timbers Resort Management was

breaching the terms of the Timbers Non-Complete Agreement by both using business concepts created by Plaintiff and disparaging Plaintiffs plan, while interfering with and competing with Plaintiff with respect to the Kauai Deal dy pitching their own Timbers development plan without the consent of Tower as required under the Timbers Non-Compete Agreement.

140.    These exchanges by Defendants all took place without Plaintiffs knowledge or authorization.

141.    Plaintiff is informed and believes, and upon such information and belief alleges the continuous assault by Defendants upon Plaintiff's Equity Partner (Oaktree Real Estate) to select a better development that would insert Defendants in the drivers seat continued from the signing of the Non-Compete in July 2014 all the way through the PSA closing date of December 31, 2014 (5 months), all without disclosing to Plaintiff the assaults or the Secret Timbers Development Plan.

142.    The only way Timbers Resort Management was able to present its Secret Timbers Development Plan to Oaktree Real Estate on such an expedited basis - mere days or weeks compared to the seven months it took Plaintiff to originally create the materials - was through their unauthorized and wrongful use of Plaintiff's confidential and proprietary work product for Defendants' own concealed development plan to sway Equity Partner toward a Timbers plan and Timbers involvement in violation of the Non-Compete Agreement.

143.    All of the above conduct and the communications by Defendants continued without Plaintiff's awareness or consent.

144.    All Timbers Defendants communications that undermined Plaintiff's development plans in favor of their own, directly violated the express terms of the Timbers Non-Complete

Agreement.

145.    Defendants' conduct has had a disastrous impact on Plaintiffs role, income and profits in the Kauai Deal.

146.    That impact was completely unknown at the time in late 2014, and the secret forces driving Defendants to defeat Plaintiffs relationship with its Equity Partner Oaktree Real Estate- as well as driving Plaintiff out of the picture were unknown by Plaintiff at any time before the closing of the FSA Agreement.

**C.    David A. Burden Secretly Sells Controlling Stake In Timbers Resort Management At Same Time He Executes Timbers Non-Compete Agreement With Plaintiff**

147.    As of early 2014 and upon signing the Non-Compete, Plaintiff was unaware of any business deals or organizational relationship between Oaktree Real Estate and Defendants.

148.    As of signing the Non-Complete, Plaintiff only knew that Oaktree Real Estate had supported Plaintiff to interview Defendant Timbers Resort Mai1agement as a potential consultant.

149.    There was no reason for Plaintiff to believe that Defendants would engage in the covert activity described above when Plaintiff entered into the Timbers Non-Compete Agreement in July 2014.

150.    However, at the same time that Timbers Resort Management was seeking on the surface to be a "consultant" of Plaintiff, Timbers Resort Management and specifically David A. Burden, for himself and Defendants, was separately negotiating with the Equity Partner of Plaintiff (Oaktree Real Estate) for a big payoff by selling a controlling interest to Oaktree Real Estate.

151.     In July 2014 when the Non-Compete was being negotiated, neither Timbers Resort Management nor David A. Burden disclosed those discussions or their secret relationship with Equity Partner Oaktree Real Estate to Plaintiff.

152.     Plaintiff is informed and believes, and upon such information and belief alleges, Timbers Resort Management had a strategy to keep the "deal" confidential while Timbers Resort Management gained access to the strategies and information created by Plaintiff about the Kauai Deal.

153.     On August 28, 2014, after Plaintiff had already entered into the Timbers Non-Compete Agreement, Timbers Resort Management and Oaktree Real Estate completed a transaction whereby Oaktree Real Estate became the majority shareholder of Timbers Resort Management, but none of the Defendants provided notice to Plaintiffs of such details.

154.     Plaintiff is informed and believes, and upon such information and belief alleges, that after the selling the controlling interest of Timbers to Oaktree Real Estate, the founder David A. Burden was sharing Board of Director seats on Timbers' Board with three members of Oaktree Real Estate (Mr. John Brady, Mr. Taejo Kirn and Mr. Derek Smith).

155.     After the sale of the controlling interest in Timbers Resort Management to Oaktree Real Estate on August 28, 2014, Defendants were even more motivated to have Timbers Resort Management (now an affiliate and under the control of Oaktree Real Estate) conceal the Secret Timbers Development Plan and any and all of the other Defendant violations of the Timbers Non-Compete Agreement.

156.     Plaintiff is informed and believes, and upon such information and belief alleges, that Defendants specifically sought, immediately after the August 28th sale of the controlling

interest, to finalize the Timbers Secret Development Plan to influence the Equity Partner to push Plaintiff out of the Kauai Deal in order to allow a "better" Timbers plan and also to hoard and transfer to David Burden, Gregory Spencer and Timbers Resort Management the development fees, sales fees, management fees, sponsor promote profits and other development related fees and profits all for Defendants, to the detriment of Plaintiff.

157. Notwithstanding this scheme and Timbers Secret Development Plan, Defendants did not disclose to Plaintiff that they were intending to (a) deliver an alternative Timbers plan, and/or (b) influence the Equity Partner to exclude Plaintiff 100% from any management fees, development fees, or development alternatives that would be much more profitable than Defendants' Secret Timbers Development Plans.

**D.     The Original Joint Venture For the Kauai Deal**

158. After months of negotiating the Joint Venture Terms Sheet only between Tower Plaintiff and Oaktree Real Estate, which began on May 8, 2014 and was concluded on in August 2014, relating to the Kauai Deal, the formal date of the mutually executed Joint Venture Terms Sheet was dated in August 12, 2014 ("Original Joint Venture").

159. The purpose of the Original Joint Venture was for Tower to acquire, develop and manage the Kauai Deal and fro the Equity Partner to provide the majority of the private equity thus, the Original Joint Venture was only between two exclusive parties, namely Tower Development and Oaktree Real Estate (and their respective funding affiliates).

160. Per the Joint Venture Tenn Sheet, the parties would include (1) a subsidiary of Oaktree Real Estate, (2) funding investment entity and affiliate but a non-party Tower Hotels Fund 2014, LLC and (3) Plaintiff.

161.     Plaintiff was to be the developer of the Kauai Deal as clearly agreed to and set forth in the Original Joint Venture.

162.     Under the Original Joint Venture, Plaintiff was to be paid a development fee for being the developer equal to two percent (2%) of the "Project Costs" as they are incurred ("Plaintiffs Development Fee") to implement Plaintiffs development team and process the Tower development of the Kauai Deal and a twenty percent (20%) promote interest for performing the development services for Plaintiffs strategic development plans.

163.     The Modified Joint Venture (defined below and entered into four (4) months later) was modified to eliminate the Plaintiffs Development Fee and reduced the "promote" to ten percent (10%), which was agreed to by Plaintiff, only because Plaintiff never was informed of:

(x) the secret dealings of Defendants to eliminate Tower from the Kauai Deal; or (y) the Secret Timbers Development Plan, both of which were actions in violation Non-Complete.

164.     After August 2014, Plaintiff worked with Oaktree Real Estate to memorialize the Original Joint Venture (as specifically defined in the Joint Venture Terms Sheet) in a formal Limited Liability Company Agreement that was substantially negotiated and prepared ("Original LLC Agreement"), which however was unsigned based on Plaintiffs belief that it would be signed as of the closing of PSA, which ultimately occurred on or about December 31, 2014.

165.     In anticipation of finalizing and in furtherance of the terms of the Original Joint Venture and the LLC Agreement, Plaintiff expended substantial amounts of time, money and resources to developing and strengthening pre-existing relationships with various hotel and resort brands and management companies, including the top two global hotel/resort brands, for

the purpose of developing the Kauai Deal.

166.     Through those efforts, Plaintiff was in position where it would be able to proceed with Tower's development plans for the Kauai Deal to the significant benefit of Plaintiff without Defendants' involvement.

167.     Indeed, Defendants were informed that Plaintiff had agreed to sign a term sheet whereby a top global hotel/resort brand would contribute a significant key money package (estimated at $30 million) to Plaintiffs project in exchange for the globally recognized name brand being on the project as the "demand driver" (that experts would attest is a much more successful demand driver than Defendants brand of Timbers) that would allow Tower to create the highest and best use and highest valuation possible for the entire Kauai Deal's 694 developable resort units located within the Kauai Deal.

168.     Throughout fall 2014, Plaintiff and the Oaktree exchanged materials, including the Oaktree's financial models and projections for the Kauai Deal that was accomplished through months of joint efforts and work of Tower and Oaktree personnel (collectively, the "Tower/Oaktree Financial Model").

169.     On one such document from Oaktree in early December 2014, Oaktree projected that Plaintiff would receive a $13,320,000 of"Fees" and "Sponsor Promote" profits of $51,454,000, as a result of the "demand driver" global hotel brand recommended by Plaintiff (specifically not the Timbers brand).

170.     To the best of Plaintiffs knowledge, since no other model or plans were disclosed by Defendants to Plaintiffs, this model developed by the Oaktree and distributed to Plaintiff on December 8, 2014 was Oaktree Real Estate's approved financial model for the Kauai Deal (that

was revised and polished by and between Plaintiff and Oaktree staff at least five to seven times over four months from September to December 2014).

171. Unbeknownst to Plaintiff, however, Defendants were continuing their own self-centered Timbers plans to persuade Oaktree to cancel the development plans underlying the Tower/Oaktree Financial Model and convince Oaktree to push Plaintiff out of the project due to Defendants' clandestine goal of taking all of the fees and profits that would have otherwise been received by Plaintiff.

172. Further, Defendants turned up the heat on their efforts right before Plaintiff were ultimately to close escrow on December 31, 2014.

173. Plaintiff did not discover until the second half of 2015 that Oaktree actually was convinced by Defendants to pursue the Secret Timbers - not Plaintiffs plan - which ultimately would eliminate Plaintiffs $51,454,000 Sponsor Promote profits and management and development fees in excess of $13,000,000.

174. In addition, contrary to any discussions with Plaintiff at the time of closing of the PSA Agreement, Defendant Timbers ultimately would convince Oaktree Real Estate to give Defendants 50% of Plaintiffs development Sponsor Promote profits and one hundred percent (100%) of all the other fees, which again are in direct conflict with the Timbers Non-Compete Agreement.

175. All of these decisions giving Timbers fees and profits otherwise entitled to Plaintiffs under the Original Joint Venture were processed by Timbers and Oaktree Real Estate without Plaintiff's awareness of the Secret Timbers Development Plan prepared during the 4 months before the PSA closing on December 31, 2014, and were in furtherance of Defendants'

effort to push Plaintiff out of the picture at a time when Plaintiff was under extreme financial and reputational pressure to close escrow merely a few days before Christmas 2014, with the actual closing date on the Kauai Deal scheduled for December 31, 2014.

176.    Overtly, Defendants continued to support Plaintiff's plan (including Plaintiffs plans for bringing in a known, respected and creditworthy global luxury hotel/resort brand, with whom Plaintiff had successful negotiations during escrow) for the Kauai Deal as Defendants had throughout the entire escrow despite Defendant knowing full-well that Defendant had prepared the Secret Timbers Development Plan that Defendant actually intended to implement after the closing of the PSA.

177.    Indeed, Oaktree provided data to Plaintiff showing that Plaintiff would receive $51,454,000 in Sponsor Promote profits by pursuing the global luxury hotel/resort brand and related Plaintiff development plan.

178.    Defendants were extremely nice to Plaintiff in continuing discussions regarding the Kauai Deal because they needed Plaintiffs local relationships and presence and expertise in Kauai, and they also knew that the closer they got to Plaintiffs December 31, 2014 deadline to close escrow, the more Plaintiff would have no other alternative to replace Oaktree Real Estate's Equity Partner commitment as mutually agreed to in the Joint Venture Terms Sheet and would be cornered into having to agree to have Defendants become involved in some fashion in the Kauai Deal.

179.    Had Plaintiff known at the time of the breaches of the Non-Compete Agreement in August and September of 2014 regarding: a) the Secret Timbers Development Plan; or

b) that Defendants' true plan was to pursue a Timbers Resort Management development project rather than Plaintiffs proposed plan that had a globally recognized brand, Plaintiff would have terminated immediately its discussions with both Defendants and Oaktree Real Estate and closed the Kauai Deal with another private equity limited partner, as Plaintiff would have had plenty of time to replace Oaktree Real Estate with a new private equity partner.

180.    Defendants knew this and could not afford to allow Plaintiff this time to replace Oaktree as the private equity partner due to the incredible priceless value of the Kauai Deal for the benefit of increasing the value of Timbers company and lining the pockets of the shareholders with profits that would have otherwise been Plaintiffs.

181.    Covertly, Defendants continued their plan to oust Plaintiff.

182.    Plaintiff is informed and believes, and upon such information and belief alleges, rather than advising Oaktree it could not entertain any business transactions that would violate the Timbers Non-Compete Agreement that it entered into with Plaintiff, Timbers Resort Management continued its marketing assault that Timbers would be very interested in pursuing the development further and that it could add a multitude of value through development, management and sales and marketing.

183.    Unbeknownst to Plaintiff, since it did not have the Secret Timbers Development Plan, Plaintiff did not know Timbers did not include Tower's 200-room phase one luxury hotel/resort as the initial demand driver of the development, and instead focused the development on its own self proclaimed Timbers fractional and condominium product, which would ultimately eviscerate or greatly diminish the Sponsor .Promote profits that would have been procured by Plaintiff under the Original Joint Venture if either: (a) Timbers would not have

violated the Timbers Non-Complete Agreement, or (b) Defendant Timbers would have disclosed its Secret Timbers Development Plans when created allowing Plaintiff enough time to purchase the Kauai Deal with other consultants and other private equity sources.

184.    Plaintiff is informed and believes, and upon such information and belief alleges, Mr. Spencer disparaged Tower prior to the closing of the PSA Agreement and further marketed that the "developer" of the project should be Timbers.

185.    These communications violated the Timbers Non-Compete Agreement, including Timbers Resort Management's agreement not to interfere with Tower Development's role in the Kauai Deal.

186.    Again, Mr. Spencer and Mr. Burden failed to point out the fact their actions violated the Timbers Non-Compete Agreement and kept secret from Plaintiff the entire scheme.

187.    Plaintiff is informed and believes, and upon such information and belief alleges, in December 2014, right before the closing of the PSA Agreements, the Timbers executives recommended only a Timbers development team and were ready to "set the trap" to take the Kauai Deal away from Plaintiff.

188.    Plaintiff is informed and believes, aud upon such information and belief alleges, Defendants were clearly secretly discussing in December 2014 pushing Plaintiff (and Mr. Bushor) out of its own deal after Mr. Bushor spent over fourteen (14) months of work to procure the best 450-acre 694 fully entitled resort units ("ready to build") development site in Hawaii.

189.    The forgoing efforts of Timbers Resort Management to disparage and destroy Plaintiffs role in the Kauai Deal were additional direct violations of the Timbers Non-Compete Agreement.

190.     Defendants knew that their keeping their relationship with Oaktree secret was putting Plaintiff in an untenable position inasmuch as they knew Plaintiff needed to close escrow on the $60,000,000 Kauai Deal by December 31, 2014.

191.     The longer Defendants played their game (and especially if they could hide the Secret Timbers Development Plan until after the closing of the PSA on December 31, 2014) the less likely it became for Plaintiff to secure an alternative joint venture partner and other funding and underwriting sources to close escrow on the Kauai Deal.

192.     Defendants exploited Plaintiffs position and - without disclosing Defendants' secret communications - never allowed Plaintiff to believe that Oaktree would not proceed with the Original Joint Venture Terms Sheet as Plaintiff believed from July 2014.

193.     On or about December 23, 2014, just about a week before the closing of the PSA for the Kauai Deal was scheduled to close escrow, leaving no time for Tower Development to find a replacement equity partner, Equity Partner asked Plaintiffs to modify the Original Joint Venture and LLC Agreement to add Timbers into the Modified Joint Venture but never disclosed the Secret Timbers Development Plan.

194.     Plaintiff is informed and believes, and upon such information and belief alleges, during the last week of December 2014, Defendants formalized their secret relationship with Oaktree Real Estate based on Secret Timbers Development Plan to reduce the role of Plaintiff and change the Original Joint Venture. Concurrently therewith, Timbers Board of Directors Taejo Kim and Derek Smith (who were also Equity Partner's executives) requested to have Defendants added to the Original Joint Venture as an additional development manager in the newly proposed modifications to the Modified Joint Venture Agreement, which would be called

Tower Kauai Lagoons, LLC ("Modified Joint Venture").

195.    The members of the Modified Joint Venture finalized and executed the same concurrently with the closing of the PSA on December 31, 2014, were and are comprised of Plaintiffs entities including: Tower entities being (1) Tower Hotels Fund 2014, (2) Tower Hotels Kauai, LLC; and Oaktree Real Estate's entity being (A) Kauai Lagoons Grand Avenue Partners, LLC, an Oaktree Real Estate's subsidiary (continued to be referenced herein as "Equity Partner" or "GAP").

196.    Mr. Kim and Mr. Smith (who at the timing of signing the Modified Joint Venture were both Board of Directors of Timbers Defendant and also executives of Oaktree Real Estate) signed the Modified Joint Venture Agreement on behalf of Equity Partner approving the insertion of Defendant as an additional "development manager".

197.    The Modified Joint Venture defines "Local Development Manager" as Tower Development Inc., which is Plaintiff herein.

198.    The Modified Joint Venture Agreement defines the "Development Manager" as Timbers Resorts, which is Defendant herein.

199.    The Modified Joint Venture eliminated all of Plaintiffs 2% development fees (which were listed in the Original Joint Venture).

200.    Equity Partner and Plaintiff agreed to remove all of these fees with the assumption that all future development fees would be removed until final business plans and development plans are evaluated after the closing of the PSA all the time Plaintiff didn't know that the Secret Timbers Development Plan was already known by Defendant and Equity Partner.

201.    After the closing of the PSA, in order that the "trap" was not was not exposed, the

Modified Joint Venture (duties drafted and prepared by Oaktree Real Estate) granted very limited duties to Timbers and did not provide any compensation to Timbers as outlined specifically in the document referenced herein as the "Modified Joint Venture" as Section 7.03(b)(i)-(viii) as follows:

(b) Without limiting the foregoing, it is anticipated that Manager shall perform the following duties:

(I) Oversee, coordinate and process the operations, including without limitation, the management on a day-to-day basis of any and all of the assets which comprise Company Property, and prepare all communications with relevant third parties;

(ii) Implement the Budget and the Operating Plan and pay expenditures incurred in accordance with such documents.

(iii) Keep and maintain the Company Property in good condition and oversee all repairs, maintenance and changes, and purchase all supplies and materials, necessary for the operation and entitlement of the Company Property in accordance with the provisions of the Budget and Operating Plan.

(iv) Process all entitlements and manage any development of the Company Property in accordance with the provisions of the Budget and Operating Plan.

(v) Obtain and maintain, at the Company's expense, all licenses, permits, certificates, consents, approvals and other entitlements required for the operation of the Company Property.

(vi) Maintain records, books and accounts with respect to the management,

rehabilitation and operation of the Company Property.

(vii) Prepare and deliver monthly and annual operating reports detailing the events, status and progress of the Company Property in such form as may be required by the Executive Committee.

(viii) Implement all decisions and directives of the Executive Committee. [Note, the Executive Committee was comprised of Edward Bushor of Tower, and Mr. Kirn and Mr. Smith of Oaktree]

202. These changes to the Original Joint Venture Terms Sheet, which ultimately were inserted into a new entity called "Tower Kauai Lagoons" were completed concurrently with the close of escrow on December 31, 2014, and were included in the Limited Liability Company Agreement of Tower Kauai Lagoons, LLC (the "Modified Joint Venture Agreement") that was the entity that owned the Kauai Deal after the closing of the PSA ("Ownership").

203. The signatories to the Modified Joint Venture Agreement are Mr. Bushor on behalf of Plaintiff and non-party Tower Hotels Fund 2014, LLC and Mr. Kim and Mr. Smith on behalf of non-party Kauai GAP (an affiliate of Oaktree Real Estate).

204. Had Plaintiff known the truth about the Timber Defendants' dealings with Tower's Equity Partner, Oaktree Real Estate, including knowledge of the Timbers disparaging and self-dealing communications by Timbers and Secret Timbers Development Plan, in violation of the Timbers Non-Compete Agreement, and had they known of Timbers secret intention to push Plaintiff out of the management and development of the Kauai Deal evidenced by the Secret Timbers Development Plan back in August and September 2014, Plaintiff never would have continued with the Original Joint Venture and would never have signed the

Modified Joint Venture Agreement.

205.    Instead, Plaintiff would have been able to take other steps to secure its rightful

Sponsor Promote profits, development fees and other fees and substantial other profits - which

were anticipated and assumed by all parties to the Original Joint Venture Terms Sheet.

206.    Pursuant to the Modified Joint Venture Agreement, the Modified Joint Venture

Agreement was modified during the last week of escrow based on the violations by Defendants

to the Timbers Non-Compete Agreement to eliminate the financial benefits to Plaintiff.

207.    The Modified Joint Venture Agreement revisions did not expressly provide for

any separate compensation or fees to be paid to Timbers Resort Management for performing its

responsibilities under section 7.03 of the Joint Venture Agreement and at no time did any party

prior to the December 31, 2014, disclose to Ownership or Plaintiffs, and at no time plior to the

closing of the PSA did Defendants (or any third party) ever disclose to Plaintiffs any future

agreements, compensation or fees that would be paid in favor of Timbers or were contemplated

to be paid to Timbers, when in fact, that was the secret plan and intent of Defendants in the

Secret Timbers Development Plan.

208.    Notwithstanding the foregoing paragraph and limitations on Timbers Resort

Management's role as identified in the eight items of Section 7.03(b) (i)-(viii), Timbers is

receiving many fees and compensation not authorized by either the Non-Complete without the

authorization by Plaintiff and Timbers is perfom1ing many more functions than permitted in the

Modified Joint Venture Agreement for the benefit of maximizing only the value of the Timbers

company in direct breach of the Modified Joint Venture Agreement, which also had the

protection known by Plaintiffs requiring the approval of Plaintiff for Timbers to do any functions

or receive a11y fees or compensation or enter into a11y agreements specifically in violation of Section 7.04(a), many more functions a11d agreements not authorized by either the (a) Non-Compete Agreement or (b) the Modified Joint Venture Agreement, which had express contractual protections in favor of Plaintiff that were known by Defendant, which required Timbers Defendants to gain the approval of Plaintiff to compete with Plaintiff or procure any agreements, fees or compensation relating to the Kauai Deal; Timbers Defendants (including Timbers' Board of Directors Mr. Burden, Mr. John Brady, Mr. Kim and Mr. Derek Smith) knowingly violated all contractual protections and acted as if Timbers is above the law.

209. Plaintiff was only willing to have Timbers as a ministerial management consultant in the Modified Joint Venture and allowing the eight (8) duties outlined in Section 7.03(b)(i)-(viii) if and only if the Modified Joint Venture contained a Tower right to approve of any transaction agreement, or any compensation that would be entered into with Timbers that would occur after the close of escrow for the Kauai Deal.

210. This absolute approval right was expressly included in the Modified Joint Venture that gave Plaintiff the right to approve of any future transaction after the closing involving Timbers (which Defendant Timbers Resort Management clearly knew as an affiliate) based on Section 7.04(a) of the Joint Venture. Section 7.04(a) of the Joint Venture states,

7.04   SERVICES AND FEES.

(a)     Notwithstanding anything to the contrary contained in this Agreement, any agreements with an Affiliate of any Member must be approved by the non-Affiliated Members, and no other fees or compensation will be paid by the Company to any Member or any of its Affiliates.

211. In addition to the fact that Timbers was aware of the Non-Compete Agreement and also the Modified Joint Venture Agreement, Timbers was aware of the fact it does not

provide for any right for separate compensation or fees to be paid to Timbers Resort Management due to the fact that Section 7.04(a) of the Modified Joint Venture Agreement expressly prohibits Ownership from entering into any contracts or agreements with Timbers (since it is an "Affiliate" as defined in the JV Agreement), unless such contracts or agreements are approved by the non-affiliated Members (meaning Plaintiff). Specifically, Section 7.04(a) provides in pertinent part, as follows:

> Notwithstanding m1ything to the contrary contained in this Agreement, any agreements with an Affiliate of any Member must be approved by the non-Affiliated Members, and 110 other fees or compensation will be paid by the Company to any Member or any of its Affiliates ... (Emphasis added.)

212.    Timbers Resort Management is an "Affiliate" of the party to the Modified Joint Venture Agreement being Kauai GAP in that, among other things, both Timbers Resort Management and Kauai GAP are under the control of Oaktree Real Estate.

213.    Plaintiff and Tower Hotels are not Affiliates of Kauai GAP or of Timbers Resort Management.

214.    Because Timbers Resort Management is an Affiliate of Kauai GAP, no contracts, or agreements, or fees or compensation could be agreed upon by Timbers Resort Management unless such agreements, fees, and compensation are approved and agreed to by Tower Hotels and non-party Tower Hotels Fund 2014.

215.    Despite knowing these provisions existed, Timbers Defendant acted in absolute disregard of the Non-Compete and in absolute disregard of the Modified Joint Venture Agreement Section 7.04(a) approval rights, as well as taking fees and other compensation and entering into agreements and understandings without first seeking approval of Plaintiff.

**E.      Escrow On The Kauai Property Closes, And Defendants Continue With**

## Their Scheme

216.    Having "set the trap" for Plaintiff, Defendants could now proceed with springing the trap.

217.    On December 31, 2014 - two days after Plaintiff allowed Defendants to come into the Modified Joint Venture with very specific limited management duties, Defendants protected themselves since they had the contractual limitations in both the Non-Compete and Section 7.04(a) to the Modified Joint Venture Agreement, and therefore, Plaintiff was willing to close escrow on the Kauai Deal.

218.    At that point, Defendants took over limited duties relating to ministerial management responsibilities of the Kauai Deal.

219.    Instead of developing and managing the Kauai Deal as it had planned under the Original Joint Venture with Plaintiff's Equity Partner, after the closing of escrow, Plaintiff was relegated by Timbers decision making and recommendations to essentially to the role of a minority investor as Timbers ignored Plaintiffs development plans 100% after the closing date of December 31, 2014, and further ignored any of Plaintiff's feasibility studies or even their own that stated that need for a demand driver hotel brand consistent with Plaintiff's original development plans presented to Equity Partner under the Original Joint Venture.

220.    As part of Defendants' concerted plan to prevent Plaintiff from receiving their $51,454,000 in Sponsor Promote profits and over $13,320,000 in Development Fees, Timbers Defendant barred Plaintiffs from earning any further development fees and further barred Plaintiff from implementing any higher return investment plans (such as the global branded demand driver luxury originally underwritten by Tower and Oaktree Real Estate) for the Kauai

Deal by, among other things, analyzing and processing only its own Timbers plans centered solely on the Secret Timbers Development Plan that was originally prepared August and September 2014, four (4) months before the closing of the PSA.

221.　Plaintiff and/or its affiliates Tower Hotels (a Member of the Modified Joint Venture Agreement) have not approved or agreed to any contracts or agreements or fees or compensation between Ownership and Defendant Timbers Resort Management.

222.　Before or after the closing of the FSA on December 31, 2014, Plaintiff and its affiliate, Tower Hotels were never presented a request by Timbers for approval by Plaintiff of any exception to the Non-Compete or approval by Plaintiff of a Section 7.04(a) exception. In fact, Timbers ignored both contractual obligations as if they were above the law with respect to complying with contractual provisions.

223.　Before or after the closing of the FSA on December 31, 2014, Plaintiff and its affiliate, Tower Hotels were never presented a request by Timbers for approval by Plaintiff of any new matters that were subject to the Modified Joint Venture Section 7.04(a) approval requirements for agreements, compensation or fees that Timbers obviously was seeking to procure from the Ownership.

224.　After the closing of the FSA, Timbers has refused Plaintiffs multiple requests to see the actual contracts and agreements and underlying fees and compensation Timbers sought after the closing of the FSA.

225.　Despite the facts that Plaintiff and its affiliate Tower Hotels never approved any fees, compensation, contracts or agreements in favor of Timbers Resort Management, Plaintiff is informed and believes, and upon such information and belief alleges, that Defendant Timbers has

entered into contracts or agreements or understandings (secretly behind Plaintiffs back) pursuant to which Timbers Resort Management has been engaged to develop the Kauai Deal with the expectation of significant economic benefit, fees and/or compensation, including without limitation, fees and compensation and marketing compensation relating to the residences that are to be built as pari of phase 1 of the development by Timbers Defendar1t.

226. Although Defendants have not delivered copies of any final contract(s) with Timbers Resort Management, Plaintiff is informed and believes, and upon such information and belief alleges, that a contract between Ownership and Timbers Resort Management provides for compensation to Timbers Resort Management that could exceed $25 million.

227. Tower Hotels is further informed and believes, and upon such information and belief alleges, that Defendants have caused Ownership to agree to pay, and to actually pay, for lavish travel, schooling and pet expenses for Timbers Resort Management's executives a11d employees, including private school tuition for the children of Timbers Resort Management's executives and employees, and numerous other expenses to a11d for the benefit of Timbers Resort Management and its executives and employees.

228. Defendants are causing Ownership to make these payments without any prior approval or consent by, Plaintiff, as required by the Modified Joint Venture Agreement.

229. Plaintiff is informed and believes, and upon such information and belief alleges, Defendants are controlled by decision making of Greg Spencer and David Burden of Defendants.

230. In doing the acts and things alleged herein, Defendants are attempting to squash Plaintiff's development rights by hiding behind Oaktree Real Estate decisions yet all actions of Defendants in violating the Timbers Non-Compete was so Timbers could line its own pockets

rather than allow Plaintiff to reap the profits of the development they procured 100% on their own while enriching only Timbers at Plaintiff's expense.

231. Acting with reckless regard for their responsibilities and obligations under the Timbers Non-Compete Agreement, Defendants' failure to follow or acknowledge a simple and straightforward express non-competition provision in the agreement that they signed is egregious bad faith and malicious behavior.

232. Defendants have breached the Timbers Non-Compete Agreement by, among other things:

   a. Creating and entering into discussions with Oaktree how to come up with an alternative plan focused on Timbers business rather than the worldwide brands Plaintiff would have implemented had Timbers never recommended themselves over Plaintiff's business plans and agreeing to be paid and actually receiving fees and compensation by Timbers Resort Management, all without Plaintiffs approval;

   b. Creating and entering into a contract or agreement for Timbers Resort Management to develop the Kauai Deal, in that the development plan was created in September 2014 in direct competition to Plaintiffs plan in violation of the Timbers Non-Compete Agreement;

   c. Approving an $8 million land parcel allocation for the same parcel that Plaintiff had proposed with a worldwide brand at over $20 million;

   d. Refusing to provide Plaintiff with access to, or copies of, books and records of the Ownership, including but not limited to books and records reflecting the details of any and all contracts or agreements or fees and compensation in favor of Timbers Res01t

Management related to the Kauai Deal;

e. Accepting any fees or other compensation paid to, or for the benefit of, Timbers Resort Management and its executives and employees in direct violation of the Timbers Non-Compete Agreement; and

f. Implementing a Timbers-based development plan that is designed to maximize fee income and value to Defendants, including the fact that Defendants are developing the Timbers Resort Management branded property first on the most valuable land parcels, at substantially below market land allocation, instead of maximizing the value of the project to the members by following Tower Development's plan to bring in a respected worldwide brand name other than the Secret Timbers Development Plan, all the time Timbers knew the worldwide brand committed to fund significant key money ($30 million) for Plaintiff's plan for the Kauai Deal, when in fact Timbers Resort Management is not contributing any key money, all competing directly with Plaintiff's business plans.

233. Since the time Defendants entered into the Modified Joint Venture Agreement, Timbers Resort Management has made no real effort to do anything with the Kauai Deal other than to pursue Timbers Resort Management's purported plans with full disregard of any higher valued competitors of which Plaintiff had feasibility studies showing such plans were supported by the market when the Timbers plans were not supported by the market.

234. Those Timbers plans are derivative of and in direct competition with Plaintiffs plans but with much less favorable profit terms and less favorable anticipated rates or return for all parties.

235. In fact, based on information that Plaintiff has uncovered relating to the status of

the Kauai Deal under Timbers directions, Defendants have not only accomplished taking fifty

percent (50%) of the Tower Sponsor Promote profits now payable to Timbers Resort

Management, but those promote profits have been severely gutted or eliminated due to the

Defendants' insistence on being the "developer" and promoting the Secret Timbers Development

Plan, instead of Plaintiffs plan.

236. Timbers Resort Management's proforma has them making approximately in

excess of $25 million in fees alone and over $3 million in annual reoccurring management fees

(which could add $30 -$60 million of market value to Timbers Resorts), not to mention 50% of

Plaintiffs Sponsor Promote profits - all the time Plaintiff received zero fees currently.

237. Further, if Timbers Resort Management is allowed to fulfill its objectively

inferior business plan, the remaining Tower Sponsor Promote profits most will likely be

eliminated based on the current state of affairs at the Kauai Deal.

238. The only explanation for (1) Defendants' dogged adherence to its own Timbers

objectively less favorable plans, (2) Defendants' unapproved payment of fees and

compensation to Timbers Resort Management in violation of the Timbers Non-Compete and the

Modified Joint Venture Agreement, and (3) Defendants' refusal to provide the Plaintiff as a

partner of the Modified Joint Venture with basic information about the Modified Joint Venture

is the secret - and only recently-exposed - secret intention originally commenced in August and

September 2014, which resulted in stunning actions of Defendants to breach their myriad of

obligations to Plaintiff under the Timbers Non-Compete Agreement.

239. In committing the above acts and omissions, Defendants acted wantonly and/or

oppressively and/or with such malice as implies a spirit of mischief or c1iminal indifference to

civil obligations and/or there has been some wilful misconduct that demonstrates that entire want of care which would raise the presumption of a conscious indifference to consequences, justifying an award of punitive damages in an amount to be proven at trial.

## COUNT I: BREACH OF CONTRACT

240.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 239 as if said paragraphs were fully set forth herein.

241.    As alleged above, Plaintiff and the Timbers Defendant entered into a valid and binding Non-Compete.

242.    Plaintiff performed all of its obligations under the Timbers Non-Compete and no performance of the Defendants was excused.

243.    As alleged above, Defendants breached the terms of the Non-Compete by, among other things, using Plaintiffs confidential and proprietary materials to prepare a competitive alternative business plan identified in the Secret Timbers Development Plan (the "Secret Timbers Development Plan") and by using Plaintiffs materials and business concepts to interfere with and compete with Plaintiff relating to the Kauai Deal during the term of the Timbers Non-Complete Agreement.

244.    The Timbers Defendants' conduct has resulted and will continue to result in substantial damages to Plaintiff.

245.    As a direct and proximate result of the aforementioned wrongful, unlawful and illegal acts and/or omissions of Defendants as alleged herein, Plaintiff suffered damages in an amount to be proved at trial.

## COUNT II: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

246.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 245 as if said paragraphs were fully set fo1ih herein.

247.     The above acts and omissions by Defendants constituted a breach of the covenant of good faith and fair dealing on the part of Defendants and each of them, jointly and severally.

248.     As a direct and proximate result of the aforementioned wrongful, unlawful and illegal acts and/or omissions of Defenda11ts as alleged herein, Plaintiff suffered damages in an amount to be proved at trial.

## COUNT III: FRAUD

249.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 248 as if said paragraphs were fully set forth herein.

250.     The Timber Defendants, through Mr. Burden, Mr. Spencer, Mr. Moore and Mr. Cuthbertson and others, knowingly, falsely, and fraudulently misstated material facts to Plaintiff in the context of Defendants' scheme to defraud Plaintiff.

251.     In stark contrast to the representations that Mr. Burden, Mr. Spencer, Mr. Moore or Mr. Cuthbertson made to Plaintiff, in mid to late-2014 (July through December 2014), the Defendants were in discussions with the Oaktree Defendants for the purpose of (I) selling a controlling interest in Timbers Resort Management to Oaktree and (ii) using Oaktree Real Estate to compete unfairly with Plaintiff. In stark contrast to the representations that Mr. Burden and Mr. Spencer and Mr. Cuthbertson made to Plaintiff, Defendants violated the terms of the Timbers Non-Compete Agreement and used the Plaintiffs confidential and proprietary information to create its own competitive Secret Timbers Development Plan to convince Oaktree to eliminate Plaintiffs development plans and replace Plaintiff with Defendants for duties that

originally were slated for Plaintiff and further supported the modification of the Original Joint
Venture to allow the Modified Joint Venture to include Timbers Resorts as the Development
Manager instead of Tower Development as was 01iginally negotiated based on the actions of
Timbers in creating the Secret Timbers Development Plan prepared by Defendants in violation
of the Timbers Non°Compete Agreement and delivering such Secret Timbers Development Plan
to Plaintiffs Equity Partner to influence Equity Partner to consider using Defendants rather than
Plaintiffs in developing the Kauai Deal.

      252.    Mr. Burden, Mr. Spencer, Mr. Moore and Mr. Cuthbertson and others on behalf
of Defendants knowingly, falsely and fraudulent concealed  material  facts that Plaintiff could
not have discovered on their own, and which were necessary for Plaintiff to make informed
decisions regarding the Kauai Deal (x) during escrow and  (y) prior to signing the Modified
Joint Venture and (z) after the closing of the escrow for the Kauai  Deal.  Although  Defendants
had an affirmative duty to disclose such information, Mr. Burden, Mr. Spencer and Mr.
Cuthbertson and others on behalf of Defendants actively and knowingly concealed the
information from Plaintiff.

      253.    The false and misleading statements and representations were both material and
false in the context of inducing Plaintiff to continue with the joint venture during the period of
August 2014 through December 2014 with Oaktree Real Estate related to the Kauai Deal.

      254.    These statements and representations were known by Defendants to be false when
made and were made with the intent that Plaintiff would rely on them.

      255.    The omissions were known by the Defendants to be necessary to make other
representations not materially false or misleading and were not disclosed with the intent that

Plaintiff would be forced to rely on the representations of Defendants.

256.    Plaintiff, unaware of the falsity of Mr. Burden, Mr. Spencer and Mr. Cuthbertson's statements, representations and/or the omission or suspension of material facts, reasonably relied upon the representations concerning the Kauai Deal. Had Plaintiff known of the suppressed and concealed facts as alleged herein, they would have been able to take alternative steps to protect their plain to purchase the Kauai Deal and its investments.

257.    As a direct and proximate result of Defendants' misrepresentations and/or omissions of material facts, Plaintiff have been substantially harmed and damaged by Defendants in an amount to be determined at trial in this action, which amount Plaintiff believe will be in the tens of millions of dollars.

258.    Defendants, in conceiving, implementing and pursuing their fraudulent and deceptive practices described herein, acted with a conscious disregard of the rights of Plaintiff; they have ratified the wrongful conduct, which has resulted in Plaintiff being injured by tens of millions of dollars; and they are guilty of oppression, fraud or malice. Officers, directors and/or managing agents of Defendants have advanced knowledge of the wrongfulness of Defendants' conduct, and those officers, directors and/or managing agents of Defendants knowingly and consciously, on behalf of Defendants, disregarded the rights of Plaintiff, authorized the wrongful conduct alleged herein, ratified the wrongful conduct alleged herein and, on behalf of Defendants, acted oppressively, fraudulently and maliciously towards Plaintiff. Plaintiff are therefor, entitled in additions to the actual damages awarded, recover punitive damages for the sake of example and by way of punishing Defendants.

259.    As a direct and proximate result of the aforementioned wrongful, unlawful and

illegal acts and/or omissions of Defendants as alleged herein, Plaintiff suffered damages in an amount to be proved at trial.

## COUNT IV: INTENTIONAL MISREPRESENTATION

260.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 259 as if said paragraphs were fully set forth herein.

261.    Defendants made false representations to Plaintiff.

262.    The false representations made by Defendants are plead with specificity above.

263.    The false representations made by Defendants relates to material facts.

264.    Defendants knew that the representations made above were false when it was made.

265.    Defendants made the false representations for purposes of inducing Plaintiff to rely upon the false representations.

266.    Plaintiff was unaware of the falsity of the representations made.

267.    Plaintiff acted in reliance upon the truth of the representations made and were justified in relying upon the representations made by Defendants.

268.    The above acts and omissions by Defendants constituted intentional misrepresentation on the part of Defendants and each of them, jointly and severally.

269.    As a direct and proximate result of the aforementioned wrongful, unlawful, aild illegal acts and/or omissions of Defendants as alleged herein, Plaintiff suffered damages in an amount to be proved at trial.

## COUNT V: NEGLIGENT MISREPRESENTATION

270.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 269 as if

said paragraphs were fully set forth herein.

271.     The false information supplied by Defendants above described was the result of the failure to exercise reasonable care or competence in communicating the information.

272.     Plaintiff suffered losses as a result of the false information supplied by Defendants.

273.     Plaintiff relied on the information supplied by Defendants in making business decisions relating to the Kauai Deal.

274.     The above acts and omissions by Defendants constituted negligent misrepresentation on the part of Defendants and each of them, jointly and severally.

275.     As a direct and proximate result of the aforementioned wrongful, unlawful, and illegal acts and/or omissions of Defendants as alleged herein, Plaintiff suffered damages in an amount to be proved at trial.

**COUNT VI: TORTIOUS INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE**

276.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 275 as if said paragraphs were fully set forth herein.

277.     Plaintiff developed relationships with Oaktree Real Estate third parties and relied upon Defendants' complying with their contractual obligations under the Timbers Non-Compete Agreement and other duties to Plaintiff.

278.     Among those relationships, Plaintiff obtained commitments from: (I) Oaktree Real Estate for promote profits, development fee profits and other fees and compensation; and (ii) other worldwide hotel/resort braJ1ds of many millions of dollars to develop the Kauai Deal that would allow for millions in promote profits, development fees and other fees and

and Oaktree Real Estate third parties in that Plaintiff worked with such Oaktree Real Estate third parties and, further, Plaintiff informed Defendants of their working relationships with such Oaktree Real Estate third parties throughout their business dealings with Defendants.

280. When Plaintiff began working with Defendants, Plaintiff reasonably believed that Plaintiff would benefit economically from Plaintiffs relationships with Oaktree Real Estate third party since it had entered into the Original Joint Venture between Plaintiff and Oaktree Real Estate.

281. Defendants interfered with Plaintiff prospective economic relationships with the Oaktree Real Estate third party by engaging in an unlawful scheme to prevent Plaintiff from receiving the benefit of their agreements with Oaktree Real Estate and various third party entities and to otherwise harm Plaintiff as described above.

282. Defendants' conduct has cause substantial economic harm to Plaintiff.

283. As a proximate result of Defendants' conduct, Plaintiff has suffered damages.

284. Defendants' conduct described above constitutes clear and convincing evidence of intentional, malicious, willful, wanton, oppressive and grossly negligent conduct. Further, Plaintiff are informed and believe, and upon such information and belief allege, that the above acts were committed (1) by Defendants' officers, directors, or managing agents who were acting on behalf of Defendants, or (2) with authorization by Defendants' officers, directors or managing agents, and/or (3) with Defendants' officers, directors or managing agents knowledge and adoption or approval after it occurred.

285. Accordingly, Plaintiff are entitled to punitive damages against Defendants.

286. As a direct and proximate result of the aforementioned wrongful, unlawful and

285.    Accordingly, Plaintiff are entitled to punitive damages against Defendants.

286.    As a direct and proximate result of the aforementioned wrongful, unlawful and illegal acts m1d/or omissions of Defendants as alleged herein, Plaintiff suffered damages in an amount to be proved at trial.

## COUNT VII: UNJUST ENRICHMENT

287.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 286 as if said paragraphs were fully set forth herein.

288.    As a result of the relationships between the parties and the facts as stated above, a constructive trust should be established over the monies received by Defendants through their unlawful conspiracy to defraud Plaintiff. Such monies are traceable to Defendants, which are the current possessor of such funds.

289.    Defendants will be unjustly enriched if they are allowed to retain such funds, and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Defendants.

290.    Plaintiff have no adequate remedy at law.

291.    As a direct and proximate result of the aforementioned wrongful, unlawful and illegal acts and/or omissions of Defendants as alleged herein, Plaintiff suffered damages in an amount to be proved at trial.

## COUNT VIII: CONVERSION

292.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 294 as if said paragraphs were fully set forth herein.

293.    The above acts by Defendants with respect to Plaintiff constitutes unlawful

conversion of Plaintiffs monies.

294. The above described acts constitute conversion by Defendants and each of them, and therefore, Plaintiff is entitled to damages in an amount to be proved at trial, and the return of the money converted from Plaintiff.

WHEREFORE, Plaintiff prays for judgment against the above named Defendants, jointly and severally, as follows:

A. That judgment enter in its favor and against Defendants on each count of the Complaint;

B. That Plaintiff be awarded those special and general damages as are proved at trial;

C. That Plaintiff be awarded punitive damages as are proved at trial;

D. That Plaintiff be awarded such other and further relief both legal and equitable as this court deems just and proper under the circumstances.

DATED: Honolulu, Hawaii, December 28, 2021.

/s/Glenn H. Uesugi
MICHAEL JAY GREEN
GLENN H. UESUGI
Attorneys for Plaintiff
TOWER DEVELOPMENT, INC.

IN THE CIRCUIT COURT OF THE FIFTH CIRCUIT

STATE OF HAWAII

| | | |
|---|---|---|
| TOWER DEVELOPMENT, INC., | ) | CASE NO. _____ |
| | ) | [Contract] |
| Plaintiff, | ) | |
| | ) | DEMAND FOR JURY TRIAL |
| vs. | ) | |
| | ) | |
| TIMBERS RESORT MANAGEMENT, LLC; | ) | |
| and DOE DEFENDANTS 1-100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |

## **DEMAND FOR JURY TRIAL**

Plaintiff TOWER DEVELOPMENT, INC., by and through its attorneys, MICHAEL JAY

GREEN and GLENN H. UESUGI, and hereby demand trial by jury on all issues so triable.

DATED: Honolulu, Hawaii, December 28, 2021.

*/s/Glenn H. Uesugi*
MICHAEL JAY GREEN
GLENN H. UESUGI
Attorneys for Plaintiff
TOWER DEVELOPMENT, INC.

| **STATE OF HAWAI'I**<br>CIRCUIT COURT OF THE<br>FIFTH ☑ CIRCUIT | **SUMMONS**<br>TO ANSWER CIVIL COMPLAINT | |
|---|---|---|

CASE NUMBER

**5CCV-21-0000151**

**Electronically Filed**
**FIFTH CIRCUIT**
**5CCV-21-0000151**
**28-DEC-2021**
**02:20 PM**
**Dkt. 7 SUMM**

PLAINTIFF'S NAME & ADDRESS, TEL. NO.

MICHAEL JAY GREEN 4451 and GLENN H. UESUGI 4865
841 Bishop Street, Suite 2201
Honolulu, HI 96813
Ph: (808) 521-3336

| PLAINTIFF<br>TOWER DEVELOPMENT, INC. | VS. | DEFENDANT(S)<br>TIMBERS RESORT MANAGEMENT, LLC; and DOE<br>DEFENDANTS 1-100 |
|---|---|---|

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

MICHAEL JAY GREEN, ESQ. and PETER C. HSIEH, ESQ.

_____ ,

plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| DATE ISSUED | CLERK | CIRCUIT COURT CLERK |
|---|---|---|
| | | |

The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http://www.courts.state.hi.us



In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402; MAUI- Phone No. 808-244-2929, FAX 808-244-2777; HAWAII- Phone No. 808-961-7424, TTY 808-961-7422, FAX 808-961-7411; KAUAI- Phone No. 808-482-2365, TTY 808-482-2533, FAX 808-482-2509, at least ten (10) working days prior to your hearing or appointment date.

Form 1C-P-787 (10/19)
Summons to Complaint ⬛ RG-AC-508 (10/19)

**CIVIL INFORMATION SHEET**

**Electronically Filed
FIFTH CIRCUIT
5CCV-21-0000151
28-DEC-2021
02:20 PM
Dkt. 6 CIS**

**I (A). PLAINTIFF(S)**

TOWER DEVELOPMENT, INC.,

☐ Additional page(s) attached

**I (B). DEFENDANT(S)**

TIMBERS RESORT MANAGEMENT, LLC; and DOE DEFENDANTS 1-100,

☐ Additional page(s) attached

**II. (A). PLAINTIFF'S (S') ATTORNEY (NAME/NUMBER)**

MICHAEL JAY GREEN  4451
GLENN H. UESUGI 4865

☐ Additional page(s) attached

**II. (B). DEFENDANT'S (S') ATTORNEY (NAME/NUMBER)**

☐ Additional page(s) attached

**III.  NATURE OF SUIT**

- ☑ Contract
- ☐ Motor Vehicle Tort
- ☐ Assault & Battery
- ☐ Construction Defects
- ☐ Medical Malpractice
- ☐ Legal Malpractice
- ☐ Product Liability
- ☐ Other Non-Vehicle Tort
- ☐ Condemnation
- ☐ Foreclosure
- ☐ Agreement of Sale Foreclosure
- ☐ Agency Appeal
- ☐ Declaratory Judgment
- ☐ Other Civil Action
- ☐ Environmental Court

**IV. ORIGIN**

- ☑ (A). Original Proceeding
- ☐ (B). Transfer from District Court CIV. NO. _____
- ☐ (C). Transfer from another Circuit CIV. NO. _____

**V. DEMAND**

determined at trial

**VI. JURY DEMAND**

- ☑ YES
- ☐ NO

**VII. CLASS ACTION**

- ☐ YES
- ☑ NO

**VIII. REQUEST TO EXEMPT FROM ARBITRATION**

- ☑ YES
- ☐ NO

**IX. RELATED CASE(S)**

JUDGE _____

CIVIL NUMBER _____

| DATE | ATTORNEY NAME / PARTY NAME | SIGNATURE |
|---|---|---|
| December 28, 2021 | Glenn H. Uesugi | /s/ Glenn H. Uesugi |

RESERVED FOR COURT USE

CIVIL NO.



In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402; MAUI- Phone No. 808-244-2929, FAX 808-244-2777; HAWAII- Phone No. 808-961-7424, TTY 808-961-7422, FAX 808-961-7411; KAUAI- Phone No. 808-482-2365, TTY 808-482-2533, FAX 808-482-2509, at least ten (10) working days prior to your hearing or appointment date.